UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| MERCURY DEVELOPMENT, LLC, and | ) | |
| | ) | Civil No. 11-147-GFVT |
| EAGLE REALTY & DEVELOPMENT, LLC, | ) ) | |
| | ) | **MEMORANDUM OPINION** |
| Plaintiffs/Counterclaim Defendants, | ) | **&** |
| | ) | **ORDER** |
| V. | ) | |
| | ) | |
| MOTEL SLEEPERS, INC. | ) | |
| | ) | |
| Defendant/Counterclaim Plaintiff. | ) | |
| | ) | |

\*\*\*  \*\*\*  \*\*\*  \*\*\*

For the parties in this case, good news abounded in March 2010. Mercury Development was presented with the opportunity to sell a piece of land to Motel Sleepers, Inc. (MSI) brokered by Eagle Realty. MSI needed to buy land because its service was in demand and expanding. Within three months—and after MSI bought land from another seller—the outlook was more ominous: Mercury Development failed to sell its land, Eagle Realty missed out on its broker fees, and MSI saw that litigation over the failed deal might be in its future.

This lawsuit, including the Motion for Summary Judgment filed by MSI now before the Court, are the sour fruits of that promising beginning. For the reasons set out below, MSI's motion will be GRANTED with regard to the breach of contract and fraud claims. MSI also filed a counterclaim against Mercury Development seeking costs and attorney's fees. This claim is based on language in the real estate sale and purchase contract providing for such an award. MSI will be DENIED summary judgment on that claim.

# I

MSI's business is providing lodging and food service to clients in the transportation industry who regularly have employees working away from their permanent residences. [R. 30-1 at 3.] Norfolk Southern, a railroad company and one of MSI's clients, approached MSI about building a facility in Somerset, Kentucky to accommodate employees at Norfolk Southern's new "crew switch point." [*Id*.] MSI undertook that venture and began exploring land on which it could build this motel-like building. [*Id*. at 3-4.] Mike Whitaker, a member of and broker for Eagle Realty and a member of Mercury Development, aided MSI's search. [R. 31 at 4.]

Eventually, Cori Catlett, Executive Vice President of MSI, and Leon Catlett, President of MSI, [R. 28 at 5] visited Somerset to scout the area for a proper location. [R. 31 at 4.] On March 18, 2010, Cori Catlett (Catlett) and Leon Catlett toured the Somerset area with Whitaker. [*Id*.] The Catletts, as MSI's agents, decided to make an offer on a piece of real estate owned by Mercury Development, [*id*.] and a form real estate sale and purchase contract was prepared. [R. 31-1.] In doing that, Catlett made three handwritten notations in section seventeen of the contract, entitled "This Contract is Contingent Upon The Following." [*Id*. at 3.] Catlett conditioned the offer on three occurrences: "bank financing, signed contract from Norfolk Southern Railway, soil test." [*Id*.]

Before Whitaker, on behalf of Mercury Development, accepted MSI's offer, Whitaker sent an email to Catlett notifying of a restrictive covenant on the property. Whitaker wrote:

> In reviewing all the documents of our development, we have an exclusion in our Holiday Inn Express agreement against any other motels. I feel OK about what you are doing not conflicting with this exclusion since you are not doing business with the public[,] but I just want to make you aware of this for your future use. Let me know if this is a problem.

2

[R. 30-7 at 3.] Catlett responded with an email stating that the covenant "is no concern to me, we have been in this business a long time and this will be exclusively used by Contract employees only." [*Id*.] On March 22, Whitaker accepted MSI's offer and signed the purchase and sale contract, which included a provision that the closing of the deal must occur on or before June 18, 2010. [R. 30-6.]

MSI began to pursue financing for the purchase of the property and construction of the building. At the end of April, Malvern National Bank (MNB) agreed to finance up to $3,067,875 for the project subject to various conditions. [R. 30-9.] "Title work" for the property was conducted by MNB in May, and nothing surprising was revealed. [R. 27 at 7.] Closing on the property on June 15 seemed to be a routine matter. [R. 30-1 at 7.]

On June 14, MSI and MNB agreed to increase the amount of the loan to $4,647,634 because Norfolk Southern needed more housing capacity. [*Id*.; R. 30-10.] On that same day and in anticipation of the closing, MNB received an updated title commitment and draft deed. [R. 27 at 8.] For the first time, MNB became aware of the motel exclusion referenced above. [*Id*.] As stated in the prepared deed, "NO MOTELS other than HOLIDAY INN EXPRESS shall be located on any lot unless approved by a member of Sitaram, LLC." [R. 30-17 at 6.] This concerned MNB. It feared that if MSI's venture failed, it would own "a motel building that couldn't be used as a motel." [R. 27 at 9.] MNB received notice of this restriction so late in the process because Mercury Development did not place the restrictions in the public record until after MNB's initial title search, [R. 29 at 25] and MSI did not notify MNB of this restriction.[1]

---

[1] As to MSI's failure to disclose, it should be noted that MNB never asked MSI about any restrictions on the property and MSI provided all the information regarding the loan that MNB requested. [R. 27 at 20.]

3

[*See* R. 27 at 20.]

As a result of this information, MNB stated that it would not close the deal unless the restriction was waived. Mercury Development contacted Sitaram, the owner of the Holiday Inn Express, on June 15 and sought a waiver, but that request was declined. [R. 26 at 6.] Consequently, on June 16, Catlett sent an email to Whitaker explaining that MNB refused to provide financing and thus, "despite our good faith efforts the contingency will not be met and thus there is no legal obligation to close the transaction." [R. 30-11 at 2.] This lawsuit followed.

## II

### A

This action is in federal court on the basis of diversity jurisdiction, 28 U.S.C. § 1332. Because Kentucky is the forum state, its substantive law will be used. *Rawe v. Liberty Mut. Fire Ins. Co.*, 462 F.3d 521, 526 (6th Cir. 2006) (citations omitted). However, federal procedural law will govern as applicable, including in establishing the appropriate summary judgment standard. *Weaver v. Caldwell Tanks, Inc.*, 190 F. App'x 404, 408 (6th Cir. 2006).

Summary judgment is appropriate where "the pleadings, discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-25 (1986). "A genuine dispute exists on a material fact, and thus summary judgment is improper, if the evidence shows 'that a reasonable jury could return a verdict for the nonmoving party.'" *Olinger v. Corp. of the President of the Church*, 521 F. Supp. 2d 577, 582 (E.D. Ky. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Stated otherwise, "[t]he mere existence of a scintilla of evidence in support of the

4

plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

The moving party has the initial burden of demonstrating the basis for its motion and identifying those parts of the record that establish the absence of a genuine issue of material fact. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). The movant may satisfy its burden by showing "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp.*, 477 U.S. at 325. Once the movant has satisfied this burden, the non-moving party must go beyond the pleadings and come forward with specific facts to demonstrate there is a genuine issue. *Hall Holding*, 285 F.3d at 424 (citing *Celotex Corp.*, 477 U.S. at 324). In applying the summary judgment standard, the Court must review the facts and draw all reasonable inferences in favor of the non-moving party. *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001) (citing *Liberty Lobby*, 477 U.S. at 255).

**B**

Breach of contract claims consist of three elements: (1) the existence of a valid contract; (2) breach of the contract; and (3) damages to the plaintiff. *Ward v. Daugherty*, 14 S.W.2d 1089, 1089 (Ky. 1929). With regard to Eagle Realty's claim for breach, MSI contends that it cannot show the existence of a valid contract. As to Mercury Development, MSI presents two arguments. First, there was no breach: because the condition of bank financing was never satisfied, MSI was excused from performance. In the alternative, even if MSI breached, Mercury Development did not suffer damages or plead them particularly enough.

As to Eagle Realty's breach claim, Kentucky Revised Statute (KRS) § 371.010(8) prohibits actions based "[u]pon any promise, agreement, or contract for any commission or

5

compensation for the sale or lease of any real estate or for assisting another in the sale or lease of any real estate" unless there is a signed writing. The writing does not have to be an extensive version of the contract, and in fact does not have to be the contract itself—a writing that "relieves the court of the necessity of relying upon parol evidence to establish the existence of the contract" will suffice. *John Lawson Realty Co. v. Erler*, 2004 WL 2915346, at *3 (Ky. App. Dec. 17, 2004) (citing *Koplin v. Faulkner*, 293 S.W.2d 467, 470 (Ky. 1956)). The Agency Disclosure Statement signed by MSI [R. 31-19] is cited by Eagle Realty as sufficient. The Court disagrees.

Although MSI signed the Agency Disclosure Statement, indicating that MSI agreed to Eagle Realty serving as dual agent for itself and Mercury Development, the writing does not satisfy the Statute of Frauds. That is, there is no evidence that the exchange of consideration is contemplated in the Agency Disclosure Statement. *Fischer v. Fischer*, 2009 WL 350629, at *4 (Ky. App. Feb. 13, 2009) (noting that "consideration flowing both ways" is a fundamental requirement of a contract). It is not necessary to express the specific consideration in the writing, as KRS § 371.010 clearly explains, but consideration must be contemplated, evidenced by some reference to it in the writing; the deal must be non-gratuitous. Without mention of consideration, the relief from total reliance on parol evidence, as mentioned in *Erler*, is not achieved.

Here, parol evidence would have to substantiate both that consideration was flowing to and from both parties and the type or amount of the consideration. That stretches the Court's ability to engage in contract interpretation under the Statute of Frauds too far.

**C**

Mercury Development claims that MSI breached its contract by refusing to pay the purchase price and close on the property. [R. 1-1.] MSI seeks summary judgment arguing that it

6

did not breach because it was excused from performing by the non-occurrence of a condition precedent—the acquisition of bank financing. Mercury Development's retort is that there is a genuine issue about whether MSI acted in good faith in seeking financing.

The contract between Mercury Development and MSI clearly states that the contract is contingent on "bank financing." [R. 30-6 at 3.] MSI has filed probative evidence identifying the efforts it expended in obtaining financing. [R. 30-9 (MNB's loan commitment letter dated April 23, 2010); R. 30-10 (MNB's loan commitment letter with increased amount dated June 14, 2010); [R. 30-12 (MNB's letter explaining why it could not extend financing for this transaction dated June 21, 2010).] In terms of the summary judgment procedure, MSI has shown "an absence of evidence" in support of Mercury Development's claim. *Celotex Corp.*, 477 U.S. at 325. Mercury Development responded by claiming that MSI did not make a good faith effort in satisfying the condition, as Kentucky law requires.

"Within every contract, there is an implied covenant of good faith and fair dealing, and contracts impose on the parties thereto a duty to do everything necessary to carry them out." *Farmers Bank & Trust Co. v. Wilmott Hardwoods, Inc.*, 171 S.W.3d 4, 11 (Ky. 2005) (citing *Ranier v. Mount Sterling Nat'l Bank*, 812 S.W.2d 154, 156 (Ky. 1991)). The definition of good faith focuses on whether a party possesses a state of mind of "honesty in belief or purpose" and "faithfulness to one's duty or obligation." *Hollins v. Joe Guy Hagan Realtors Co., LLC*, 2006 WL 1946866, at * 2 (Ky. App. July 14, 2006) (quoting *Black's Law Dictionary* (8th ed. 2004)). Failure to act in good faith in bringing about the fulfillment of a condition is met with the consequence of being estopped from claiming the non-occurrence of the condition justifies non-performance. *See Estate of Riddle ex rel. Riddle v. S. Farm Bureau Life Ins. Co*, 421 F.3d 400,

406 (6th Cir. 2005) (quoting *Marshall v. Craig*, 4 Ky. 379, 386 (1809)). If reasonable jurors could find that MSI did not act in good faith, this question must be submitted to a jury. *Id*. at 409.

Mercury Development's evidence that MSI did not act in good faith rests on five bases. [R. 31 at 13-17.] First, MSI did not inform MNB about the property restriction even though MSI knew about it in March. [R. 30-7 at 2.] But, an agent for MNB testified that MSI revealed all the information about the property that MNB requested. [R. 27 at 20.] Non-disclosure is different than withholding, and no evidence in the record supports the conclusion that MSI believed it would be advantageous to it to conceal this restriction. Further, MNB checked this property's title in May and no restriction was noted. The reason MNB became aware of the restriction so close to the closing date was because of Mercury Development's tardy filing. [R. 29 at 25.] In accord with *Fougere v. Weinrebe*, 1988 WL 21821, at *8 (E.D. Penn. Mar. 3, 1988), the Court finds that the obligation to act in good faith does not require a party to provide information that is not requested. This is especially true because Mercury Development possessed the ability to prevent this from occurring.

Second, MSI only sought financing from MNB. Mercury Development argues this indicates MSI was unfaithful to its duty to find financial backing. Here, the facts encumber Mercury Development's position. MNB revoked their offer of financing a short time before the scheduled closing—and only a few days before the contractual deadline—because of this restriction. Whether another bank could have prepared a financing package in such a short time is unknown, but the implied covenant of good faith does not require MSI to engage in superhuman endeavors. Perhaps under a different factual scenario pursuing only one source of financing could move the metaphorical ball incrementally towards the line separating good and

8

bad faith, but here it does not. Good faith is not betrayed by reasonable assessment of one's situation.

Third, MSI didn't give Mercury Development enough time to obtain a waiver of the condition from Sitaram. MSI notified Mercury Development by telephone of MNB's concerns on June 15. [R. 26 at 6.] Mercury Development was told that unless Sitaram would waive the problematic condition, MNB would not close on the property. [*Id.*] Sitaram was contacted by Mercury Development and it refused to waive the condition. As recounted by Linda Skaarup, agent for Eagle Realty, Sitaram "said no[,] absolutely not. That was why [Sitaram] wanted the restriction in the document in the first place was to prevent another hotel from coming."

Mercury Development and MSI communicated through email after learning of Sitaram's position. Whitaker emailed Catlett, expressing regret over Sitaram's decision, rehashing particular facts about the way this contract had developed, reminding Catlett that the contract is "legally binding," and expressing hope that everything could be settled by the contractual deadline for closing of June 18. [R. 31-12.] Notably absent is any indication that Mercury Development desired more time to communicate with Sitaram. Also notably absent, from the Court's perspective, is an indication that MSI did not act in good faith by asking for a waiver, receiving a negative response, and moving on. MSI probably could have offered more time, evidenced by testimony from MNB's agent, [R. 27 at 10] but Mercury Development could have asked for more time too. The facts reveal that MSI exhibited a desire to complete this transaction, i.e., it acted in good faith.

Fourth, Mercury Development raises a fact question about when MBN notified Catlett that the property restriction needed to be waived. Did MBN notify MSI on the afternoon of June

9

14 or the morning of June 15 that the property restriction was problematic? This is a question of fact, but it is inconsequential. The most glaring problem with Mercury Development's argument is that MBN's agent was unsure when MSI was told:

> My recollection is I tried to get in touch with Phil McLaughlin [(an MSI employee)] . . . on the afternoon of the 14th, and to be honest with you, I'm not sure whether I got him that day or not. The closing was set—and they were to be here on the morning of the 15th, and they showed up.
> . . . .
> I know absolutely without question that it was communicated to [MSI] on June 15th.

[R. 27 at 9.] In addition, this factual issue is immaterial. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Liberty Lobby*, 477 U.S. at 248. The substantive law determines the facts that are material, *id.*, and the law of good faith, as outlined above, is not impacted by this unimportant factual question.

Fifth, an email sent from MNB to MSI on June 21 is cited as evidence that MSI was not acting in good faith. The email stated: "Attached is the letter regarding Somerset. If you need any changes or additional wording, let me know." [R. 31-14.] This is the quintessential example of a scintilla of evidence—an insufficient amount to persist past summary judgment.

"Evidence on which the jury could reasonably find for the plaintiff" is required. *Liberty Lobby*, 477 U.S. at 252. The critical question is "whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict—whether there is evidence upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." *Id*. (internal quotation marks omitted) (citation omitted). MNB's email message suggests that MSI and MNB may have conspired in order to

10

excuse MSI's performance when financing actually could have been arranged. Furthermore, MNB's officer who wrote the letter was deposed and his testimony did not refute Mercury Development's accusation in a totally convincing manner.[2] But that is the extent of the evidence in support of Mercury Development's position.

Weighing against that evidence are the facts identified above: the loan offer letters;

---

[2] The deposition testimony from Mark Roberts, Executive Vice President/Legal Counsel for MNB:

> Q: Why were you—why were you asking Phil McLaughlin if he needed any changes or additional wording?
> A: Well, I wanted to make sure—make sure it was clear to them that they understood that we could not proceed and the reasons we couldn't proceed.
> Q: Well, but your—I mean, that was a bank decision, wasn't it?
> A: It was.
> . . . .
> Q: Why are you asking the potential customer for their blessing on the letter if, in fact, all the letter is trying to do is convey the bank's position?
> A: Well, I wanted to make sure that they—that that letter—we had the discussion in the room, and I wanted to make sure that it was clear what our position was.
> Q: Is it not correct, you wanted to make sure that it covered and said what MSI wanted it to say since Mike Whitaker had been in touch with them and told them that they needed to go ahead and close this loan?
> A: No, I don't—I don't know anything about that.
> Q: Well, if you were worried that it didn't clearly convey it, wouldn't the proper thing to say is if you have any questions let me know?
> A: Possibly.
> Q: But, instead, you're giving them an insight into making sure that the wording meets their approval, correct?
> A: I look at it as making sure that there's no question as to what our position was.
> Q: But you're asking the customer for help in crafting the wording of the bank's position?
> A: No.
> Q: Okay.
> A: The letter didn't change.

MNB's title searches; the tardy filing of the restrictions on the property which prevented MNB from having earlier notice of the restrictions; and the communications on June 15 in which Mercury Development had the opportunity to obtain a waiver of the restrictions—a waiver that would have brought about the satisfaction of the financing condition. Mark Roberts also clearly stated that the decision not to extend financing rested with the bank. [R. 27 at 27.]

This email could be the one mistake in an otherwise flawless conspiracy to unjustly excuse MSI's performance. It could be a poorly worded email. It could be an email, in conjunction with the attached letter, memorializing the reasons for bank financing being refused in anticipation of litigation, as MSI contends. [R. 32 at 9.] The Court is required to draw all reasonable inferences in Mercury Development's favor. But the Court ought not opt for a conspiracy theory when evidence supports the opposing position.

In sum, and as to all of Mercury Development's arguments about good faith, the Court looks to facts in making decisions at summary judgment, avoiding credibility decisions. The material facts lead to the conclusion that Mercury Development has not rebutted MSI's weighty evidence.

D

Mercury Development submits a final argument for breach improperly couched in terms of good faith. Mercury Development classifies the "most telling evidence" of MSI's lack of good faith being that MSI sought financing only in substantial excess of the $150,000 the property cost. [R. 31 at 15.] Its argument, however, lies within the ambit of the law regarding contract ambiguity.

---

[R. 27 at 13.]

Of the utmost importance in contract interpretation is ensuring that the intentions of the parties at the time the contract was entered into are effectuated. *See Cantrell Supply, Inc. v. Liberty Mut. Ins. Comp.*, 94 S.W.3d 381, 384 (Ky. App. 2002) (citing another source). In a completely integrated contract, like that at issue here, [R. 31-1 at 3, para. 19); *see also Keith v. Robinson*, 2006 WL 3524056, at *2 (Ky. App. Dec. 8, 2006), extrinsic evidence is only allowed in particular circumstances, such as when a contract term is ambiguous. *Cantrell Supply, Inc.* 94 S.W.3d at 384. A contract term is ambiguous "if a reasonable person would find it susceptible to different or inconsistent interpretations." *Id.* (quoting *Transp. Ins. Co. v. Ford*, 886 S.W.2d 901, 905 (1994)). The answer to this question of law is easy: yes. *See id.* (citing other sources); [*see also* R. 29 at 14 (Whitaker labeling this condition as "vague."); R. 26 at 5 (Skaarup also describing this term as "vague.").] A reasonable person could find that the bank financing requirement, which triggered MSI's obligation to perform, was satisfied if MSI obtained financing to cover only the property cost. Or that person could conclude that bank financing was satisfied only if financing for the whole project costing in excess of $4 million was offered.

Consequently, "extrinsic evidence involving the circumstances surrounding execution of the contract, the subject matter of the contract, the objects to be accomplished, and the conduct of the parties" can be considered in resolving the ambiguity. *Cantrell Supply, Inc.*, 94 S.W.3d at 384 (citing several cases). Mercury Development's claim that "bank financing" only meant financing for the purchase of the land lacks reference to any evidence now before the Court.[3]

---

[3] Mercury Development cited *Price v. Bartkowiak*, 715 F. Supp. 76 (S.D.N.Y. 1989) for support, but the Court does not find this case helpful. It is a case about a residential real estate contract in which the buyers were purchasing an existing home. Additionally, the contract contained specific financing requirements. Moreover, the buyers withheld important personal financial information, resulting in the loan application being denied, and the buyers being found

13

MSI counters by pointing to two emails sent from Cheryl Mounce, Closing Agent for Southern Title, LLC, an entity helping with the closing, to Linda Skaarup on June 11. [R. 30-1 at 16.] The first email, sent by Mounce to Skaarup at 8:54 a.m., contained the U.S. Department of Housing and Urban Development Estimated Settlement Statement, which includes the amount of the construction loan—$3,067,875—as of June 11. [R. 30-15.] The second email sent by Mounce at 2:26 p.m. reached Whitaker via Skaarup. That email posed a question pertaining to the "construction loan" included in the previous email and a related survey that was required before closing. [R. 30-14.] Whitaker responded, opining about that survey, and not questioning the construction loan. [Id. at 1.]

MSI's probative and unrefuted evidence leads the Court to conclude that the only time Mercury Development misunderstood what "bank financing" meant was when MSI claimed a lack of financing excused its performance. The Court is persuaded that MSI's interpretation accurately portrays the parties' pre-litigation intent and that the contract ambiguity should be resolved in MSI's favor. Consequently, MSI did not breach this agreement.

E

Eagle Realty and Mercury Development assert that MSI committed a fraud on each of them. The evidence of fraud is that Catlett expressed to Whitaker that the motel restriction "was of no concern as MSI had been in the business of housing and feeding railroad company employees for a very long time and that the motel would be used exclusively by Norfolk Southern employees, as opposed to the general public." [R. 30-13 at 4.] That representation allegedly induced Whitaker to contract with MSI. [Id.] The holes in this argument are legion.

---

to have violated their obligation to act in good faith.

14

Judgment will be granted to MSI.

A fraud claim in Kentucky has six elements that must be proven by clear and convincing evidence: (1) a material representation; (2) which is false; (3) which is known to be false or made recklessly; (4) made with inducement to be acted upon; (5) acted in reliance thereon; and (6) causing injury. *Yeager v. McLellan*, 177 S.W.3d 807, 809-10 (Ky. 2005) (citation omitted). Because of the higher burden of proof required for fraud claims, evidence to overcome summary judgment must meet this higher standard. *Liberty Lobby*, 477 U.S. at 253.

One of Plaintiffs' failings is in identifying a false representation. Both Catlett and Whitaker held the same belief about the property restriction. [R. 30-7.] MNB, because of different considerations and incentives, found this issue concerning. MNB, then, made the decision to deny financing. This does not make Catlett's statement false—it makes it wrong. And it is only as reckless as was Whitaker's initial statement: "I feel ok about what you are doing not conflicting with this exclusion since you are not doing business with the public but I just want to make you aware of this for future use." [*Id.* at 3.]

Plaintiffs' claim also fails because it has not introduced any evidence showing that Catlett's concurrence induced Plaintiffs to contract. In other words, there has been no suggestion that Catlett believed Mercury Development would only be interested in selling its land if it was assured that the motel restriction would not create a pitfall making financing unobtainable. If Catlett did not know that, then element number four is missing. Moreover, Plaintiffs' claim that it is undisputed that Catlett's statement elicited Whitaker's assent. [R. 31 at 25.] MSI, however, cites Whitaker's deposition in which he is asked, "Did you consider this email from [Catlett] that the motel restriction was no concern, did you consider that in determining whether or not you'd

15

enter into this contract?" [R. 29 at 18.] In other words, did Catlett's representation induce reliance? Whitaker's answer: "Ummm, I don't know." [*Id*.] Therefore, element five is also missing.

Based on the lack of factual support for the elements that constitute this claim, Plaintiffs' claims for fraud cannot proceed. Judgment will be granted in MSI's favor.

### F

The final matter that must be addressed is MSI's counterclaim, [R. 19 at 4-5], seeking attorney's fees from Mercury Development.[4] In Kentucky, such fees can be awarded if contemplated in a contract. *Batson v. Clark*, 980 S.W.2d 566, 577 (Ky. App. 1998) (citing another source). However, if the contract only becomes effective after the approval of a third party, then the contract is in actuality a "conditional agreement." *In re Big Rivers Elec. Corp.*, 233 B.R. 726, 734 (W.D. Ky. 1998) (citing *Green River Steel Corp. v. Globe Erection Comp.*, 294 S.W.2d 507, 509 (Ky. 1956)). That agreement only becomes a contract when the "last act necessary for its formation is complete." *Id*. (citing *Green River Steel Corp.*, 294 S.W.2d at 509). If the third party approval is never garnered, the provisions of the conditional agreement are unenforceable. *Green River Steel Corp.*, 294 S.W.2d at 509; *see also Hopkins v. Performance Tire & Auto Serv. Ctr.*, 866 S.W.2d 438, 441 (Ky. App. 1993); *Edwards v. Inman*, 566 S.W.2d 809, 811 (Ky. App. 1978).

In this case, the Court's previous holdings indicate that the product of Mercury Development and MSI's dealings was a conditional agreement. In that agreement, there is a provision regarding attorney's fees that MSI seeks to use: "ENFORCEMENT COSTS AND

---

[4] Eagle Realty is not involved in this counterclaim because they were not a party to the

LITIGATION: Should it become necessary to institute litigation to enforce this contract, the prevailing party shall be entitled to recover costs, including reasonable attorney fees, from the non-prevailing party." [R. 30-6 at 3.] Kentucky precedent opposes MSI's position, and based on that case law, MSI is denied summary judgment on this claim.

Two cases, also pertaining to conditional agreements over real estate, outline the justification for denying this claim. In *Fentress v. Henderson*, 2005 WL 1540253 (Ky. App. July 1, 2005), a conditional agreement was reached in which the condition centered on a particular appraisal value the real estate at issue had to achieve. *Id*. at *1. The appraisal was less than required, but the seller refused to return the buyer's deposit. *Id*. The buyer filed suit, seeking the deposit as well as attorney's fees based on a provision of the agreement. *Id*. Distinguishing that case from this one, the agreement in *Fentress* had a severability clause. *Id*. Pursuant to that clause, "the deletion, alteration, or unenforceability of any provision of the contract, shall not affect the enforceability of the contract." *Id*. The court found that the attorney's fees provision could thus stand on its own and be enforced against the seller. *Id*. at 2.

More recently, in *Ward v. Taylor*, 2009 WL 1203949 (Ky. App. May 1, 2009), the court reached a similar conclusion, although the case was before the appeals court after a jury trial instead of a summary judgment decision. *Ward* also involved a dispute between a buyer and seller in which a deposit was withheld after the transfer of real property failed. *Id*. at *1. The suit included a claim for attorney's fees based on language in the agreement. *Id*. at *4. The jury ruled in favor of the buyer, and based on the jury instructions found that "the contract was not binding." *Id*. at *5-6. The jury also awarded attorney's fees based on the agreement, a decision

---

contract. [R. 30-6.]

17

which the appeals court overturned. *Id*. at *4.  The *Ward* court explained that because the contract was not binding on either party and it did not have a severability clause, the fee provision was also non-binding. *Id*. at 5.  The court noted that the jury instructions lacked clarity and opaquely opined that with more specific instructions attorney's fees might have been available. *Id*. at 6.

Regardless, the *Ward* court's ultimate conclusion controls.  The conditional agreement is non-binding on both parties, and there is no severability clause.  Consequently, MSI's motion must be denied.

This conclusion, however, leaves this claim pending as Plaintiffs did not seek summary judgment in their favor.  But MSI's only basis for its claim has been undermined. [*See* R. 19 at 4-5.]  Federal Rule of Civil Procedure 56(f)(1) is useful in this type of situation.  In accordance with it, the Court puts all parties on notice that it intends to grant summary judgment for Plaintiffs on this claim.  However, before doing so, Rule 56(f)(1) requires "notice and a reasonable time to respond."  Therefore, Plaintiffs and Defendant have fifteen (15) days from the entry of this order to file any response to the Court's stated intent.  If no responses are filed, the Court will enter an order of judgment for Plaintiffs on this claim.

### III

Accordingly, and the Court being sufficiently advised, it is hereby **ORDERED** as follows:

(1)     Defendant Motel Sleepers, Inc.'s Motion for Summary Judgment [R. 30] is **GRANTED** as to all claims against it brought by Plaintiffs Mercury Development, LLC and Eagle Realty & Development, LLC; and

(2)    Defendant Motel Sleepers, Inc.'s Motion for Summary Judgment [R. 30] on its counterclaim is **DENIED** and notice pursuant to Rule 56(f)(1) is provided above.

(3)    The dates for the Final Pretrial Conference and Trial are **SET ASIDE** pending final resolution of Motel Sleepers, Inc.'s Counterclaim.

This 11th day of February, 2013.

Signed By:
*Gregory F. Van Tatenhove*
United States District Judge